# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DOWNINGTOWN AREA SCHOOL DISTRICT** | : | **CIVIL ACTION** |
| | : | |
| *Plaintiff/Counterclaim Defendant* | : | **NO. 20-0892** |
| | : | |
| **v.** | : | |
| | : | |
| **D.S., by and through parents, C.S. and C.S.** | : | |
| | : | |
| *Defendants/Counterclaim Plaintiffs* | : | |

NITZA I. QUIÑONES ALEJANDRO, J.                                          FEBRUARY 18, 2022

# MEMORANDUM OPINION

## INTRODUCTION

On May 16, 2019, C.S. and C.S. ("Parents"), the parents of minor child D.S., filed a due process complaint with the Office for Dispute Resolution[1] pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213, and the regulations implementing these statutes, in which they averred that the development and implementation of the Individualized Education Programs ("IEPs"),[2] designed for D.S. by the Downingtown Area School District (the "Downingtown School District"), failed to provide D.S. with a free appropriate public education ("FAPE").  As a result of this alleged failure, Parents sought an award for compensatory education for the time D.S. was enrolled at the

---

[1]     The Office for Dispute Resolution is the special education resolution system in Pennsylvania.

[2]     An IEP is an individualized education program or comprehensive plan prepared by a child's IEP team, which includes teachers, school officials, and the child's parents.  *See* 20 U.S.C § 1414(d)(1)(B).

Downingtown School District and reimbursement for D.S.'s private school tuition and related expenses.

In their due process complaint, Parents further alleged, *inter alia*, that the IEPs denied D.S. a FAPE during the 2016–17 (fourth grade), 2017–18 (fifth grade), and 2018–19 (sixth grade) school years. As a remedy, Parents sought (1) an award of compensatory education from the beginning of fourth grade through the first eleven weeks of the sixth-grade school year and (2) reimbursement for private school tuition and related expenses for the remainder of the sixth-grade school year. In response to the due process complaint, the Downingtown School District maintained that its special education program, as offered and implemented, was appropriate and, therefore, Parents were due no remedy. The Downingtown School District also moved to limit Parents' claims pursuant to the IDEA's two-year statute of limitations, which is also applicable to Parents' Section 504 and ADA claims.

On August 16, 2019, following an initial administrative evidentiary hearing addressing solely the statute of limitations argument, the Hearing Officer ("HO") presiding over the due process complaint issued a Final Interim Ruling, granting the motion and limiting Parents' claims to the two-year period predating the filing of the due process complaint, *i.e.*, claims arising on or after May 16, 2017.

Following additional administrative hearings on Plaintiffs' remaining claims, the HO issued a Final Decision and Order on November 27, 2019, denying Parents' claims corresponding from May 16, 2017, through the 2017–18 school year, and finding that the Downingtown School District did not provide D.S. a FAPE from mid-November 2018 through the remainder of the 2018–19 school year and during the entire 2019–20 school year. The HO denied Parents' claims

for compensatory education, and granted Parents' claims for tuition reimbursement and related expenses for the 2018–19 and 2019–20 school years.

The Downingtown School District appealed the HO's decision before this Court, seeking reversal of the Final Decision and Order insofar as it granted Parents tuition reimbursement for the 2018–19 and 2019–20 school years.  [ECF 1].  Parents filed an answer with counterclaims, in which they sought reversal of (1) the HO's Final Interim Ruling barring Parents' claims prior to May 16, 2017, and (2) the HO's Final Decision and Order insofar as it denied Parents compensatory education for the 2016–17 and 2017–18 school years and the first eleven weeks of the 2018–19 school year.  [ECF 6].

Before this Court are the parties' cross-motions for judgment on the original and supplemented administrative records.  [ECF 17, 18].[3]  The issues in the cross-motions have been fully briefed and are ripe for disposition.  For the reasons set forth herein, judgment is entered (1) in favor of the Downingtown School District with respect to Parents' claims premised on the 2016–17 and 2017–18 school years and (2) in favor of Parents with respect to their claims premised on the 2018–19 and 2019–20 school years.  Accordingly, this matter is remanded to the HO for calculation of the amount of compensatory education due to Parents for the portion of the 2018–19 school year D.S. was enrolled in the Downingtown School District.

**BACKGROUND**

The facts relevant to the parties' cross-motions are summarized as follows:

> The Downingtown Area School District is a Pennsylvania public school district and a local educational agency ("LEA") under the IDEA with offices in Chester County, Pennsylvania.  Defendants/Counterclaim Plaintiffs are D.S., a minor student, and C.S. and C.S., the minor's parents, all of whom reside within the Downingtown School District's boundaries.

---

[3]     This Court has also considered the Downingtown School District's response, [ECF 19], Parents' response, [ECF 20], Parents' reply, [ECF 21], and the Downingtown School District's reply, [ECF 22].

According to the HO's findings of fact, D.S. attended a private parochial school through the end of second grade—the 2014–15 school year. Due to concerns with D.S.'s reading and writing skills, in the spring of 2015, the Coatesville Area School District, where D.S. then resided, evaluated D.S.'s abilities using the *Wechsler Intelligence Scale for Children*, Fourth Edition (WISC-IV). In May 2015, the Coatesville Area School District issued an evaluation report. The school psychologist interpreting the results reported that D.S.'s full-scale IQ was 104, falling within the average range of 90–109. Despite D.S.'s average intelligence and good work ethic, D.S. experienced academic difficulties because of challenges in working memory and a Specific Learning Disability with Impairment in Reading, or phonological dyslexia. The report also indicated that D.S. was in the 3rd percentile in total reading, 4th percentile in basic reading, and 3rd percentile in reading comprehension and fluency. The report further noted that D.S. showed "characteristics of a specific learning disability in basic reading skills, reading comprehension, reading fluency, and written expression." (Administrative Record ("A.R."), Doc. 9, at p. 430). Based on these characteristics, D.S. was diagnosed with a Specific Learning Disability pertaining to basic reading, reading comprehension, reading fluency, and written expression and, thus, was deemed eligible for special education. The programming recommendations included frequent progress monitoring and daily, small-group, direct instruction to improve sight word reading. Thereafter, the Coatesville Area School District developed an IEP for the start of D.S.'s third-grade school year.

In the summer of 2015, prior to D.S. beginning third grade, Parents relocated their family to the Downingtown School District and enrolled D.S. in its public schools. An IEP team from the Downingtown School District met on October 6, 2015, and—relying on Coatesville's May 2015 IEP, the evaluation report, and Parents' input—the team implemented a reading goal designed to improve D.S.'s reading from 92% accuracy at level H to 80% accuracy at level L, consistent with the *Fountas and Pinnell* ("F&P") *Benchmark Assessment System*, a system that designates instructional level expectations for reading by grade. According to the F&P's benchmarking, a student starting third grade at a reading level below L requires intensive intervention. The October 2015 IEP called for D.S. to receive instruction in language arts and speech and language therapy in a special education classroom and all other instruction in a general classroom. The IEP also provided that Parents would receive a progress report along with D.S.'s report card at the end of each marking period. Parents approved the Notice of Recommended Educational Placement ("NOREP") and signed the section of the IEP confirming receipt of a Procedural Safeguards Notice informing them of their rights.

The Downingtown School District created a new IEP in May 2016, and Parents approved the NOREP and signed the section of the IEP confirming they received the Procedural Safeguards Notice. As reported in the May 23, 2016 IEP, D.S. read at 80% accuracy or more for units two and eight out of a total of twelve reading units in the 2015–16 school year. The IEP further reported that D.S. "has

made great progress this school year" and "does well when [D.S.] focuses on reading and pays attention to the whole word." (A.R., Doc. 9, at p. 490). Testing results showed that D.S. started at level H, reading at 38 words per minute with 92% accuracy and 100% comprehension. The fall test, at level I, assessed D.S. to be reading at 57 words per minute with 90% accuracy and 100% comprehension; the winter test, at level K, assessed D.S. to be reading at 54 words per minute with 96% accuracy and 71% comprehension; and the spring test, at level L, assessed D.S. to be reading at 63 words per minute with 98% accuracy and 80% comprehension. Though D.S. read with 80% or more accuracy on only two of the twelve reading units, D.S. finished third grade able to read with 98% accuracy at level L on the spring assessment, meeting the October 6, 2015 IEP reading goal. The F&P benchmarking instructs, however, that any level below level O at the end of third grade requires intensive intervention. In addition to the improvement noted on the F&P benchmarking, the Downingtown School District referenced other assessment scores as evidence of significant educational benefit—in the AIMSweb assessment, D.S. scored 21 out of a grade-level benchmark of 77 in the fall, 35 out of 105 in the winter, and 51 out of 119 in the spring; in the MAZE assessment, D.S. scored 6 out of a grade-level benchmark of 11 in the fall, 7 out of 14 in the winter, and 5 out of 15 in the spring.

The Downingtown School District provided a multi-tiered system of support for reading remediation, with Tier 3 as the most intensive. The reading curriculum the Downingtown School District used for D.S. in the 2015–16 school year (third grade) was *Fundations*, a commercial reading program published by the Wilson Language (WL) Company. *Fundations* is a Tier 1 program for general education instruction, but, when delivered twice a day, it can be a Tier 2 intervention. It is unclear from the record whether D.S. was receiving *Fundations* at a Tier 1 or Tier 2 level. The WL Company instructors' manual advised those implementing its curriculums that students below the 15th percentile required a Tier 3 curriculum called the *Wilson Reading System*, and that students in the 15th through 30th percentiles are usually candidates for the Tier 3 *Wilson Reading System* but can be placed in a Tier 2 curriculum called *JustWords* "if there are no indications of a language-based learning disability/dyslexia." (Redacted Suppl. Ex., Doc. 16-1, at p. 3).

Despite the instructors' manual information and D.S.'s scores, in the 2016–17 school year (fourth grade), the Downingtown School District provided D.S. with the curriculum *JustWords*, as well as with *System 44* and *Step Up to Writing*. In her literacy consultation report, Jeanne Tighe, a certified Wilson Dyslexia Practitioner, explained that *JustWords* is a Tier 2 intervention program. Rebecca Leister, the Downingtown School District reading specialist, agreed that *JustWords* is Tier 2 intervention. In the Final Decision, the HO determined that D.S. was a Tier 3 student during the 2016–17 school year based on statements by Lisa Grant, D.S.'s special education teacher, who testified that D.S. was a Tier 3 student based on D.S.'s low benchmarking scores.

5

In September 2016, D.S. took a *Word Identification and Spelling Test* ("WIST") and scored <1st percentile in word identification, 2nd percentile in spelling, 1st percentile in fundamental literacy, and 3rd percentile in sound-symbol knowledge. By January 2017, D.S.'s scores on the WIST had improved and were in the 3rd percentile in word identification, 8th percentile in spelling, 5th percentile in fundamental literacy, and 6th percentile in sound-symbol knowledge. On the AIMSweb assessment, D.S. scored 54 out of a grade-level benchmark of 105 in the fall, 94 out of 120 in the winter, and 102 out of 136 in the spring. D.S.'s MAZE assessment scores were 6 out of a grade-level benchmark of 11 in the fall, 12 out of 19 in the winter, and 15 out of 19 in the spring. Finally, for the F&P benchmarking, D.S. read at level K with 95% accuracy, 50% fluency, and limited comprehension in the fall; at level L with 97% accuracy, 64% fluency, and limited comprehension in the winter; at level M with 99% accuracy, 100% fluency, and limited comprehension in a winter progress monitor; and at level O with 98% accuracy, 63% fluency, and limited comprehension in the spring. According to the F&P benchmarking, by the end of fourth grade, any level below R requires intensive intervention. These assessment results were reported in the May 22, 2017 IEP. Parents signed the section of the IEP acknowledging receipt of a Procedural Safeguards Notice. Notably, under the "parental concerns" section, the May 22, 2017 IEP reflects that "[C.S. and C.S.] would like to understand what the reading benchmarks mean so they can support [D.S.'s] reading at home." (A.R., Doc. 9, at p. 527).

In fifth grade, the 2017–18 school year, D.S. continued to receive *JustWords* and *Step Up to Writing* and began receiving *Read 180*, a remedial reading comprehension class. In an initial Tier group placement notice sent to Parents, the Downingtown School District indicated that D.S. would receive Tier 3 support in fifth grade. D.S. showed some improvement in reading in fifth grade—the fall WIST showed D.S.'s word identification in the 9th percentile, spelling in the 14th percentile, fundamental literacy in the 10th percentile, and sound-symbol knowledge in the 2nd percentile; and the winter scores showed D.S.'s word identification in the 19th percentile, spelling in the 18th percentile, fundamental literacy in the 16th percentile, and sound-symbol knowledge in the 7th percentile. Entering the fifth-grade school year, D.S.'s most recent AIMSweb scores were 8th percentile in oral reading fluency and 12th percentile in reading comprehension. In the fall of 2017, D.S. tested at the 10th percentile in oral reading fluency and the 14th percentile in reading comprehension. In the winter of 2018, D.S.'s score in oral reading fluency dropped to the 9th percentile and in reading comprehension increased to the 27th percentile. On a computer-based reading assessment, D.S.'s scores progressed throughout fifth grade from 591 in September, to 598 in November, to 652 in January, and to 797 in April. For the F&P benchmarking, D.S. read at level P with 95% accuracy in the fall, level R with 98% accuracy in the winter, and level S with 96% accuracy in the spring.

In May 2018, upon the urging of Parents, the Downingtown School District began planning for D.S.'s transition to middle school and issued a Reevaluation

Report that included, *inter alia*, input from teachers, data from recent classroom-based and state assessments, and an interview with the school psychologist. On the *Wechsler Individual Achievement Test*, 3rd Edition (WIAT-III), D.S.'s total reading was in the 8th percentile, word reading was in the 5th percentile, pseudoword decoding was in the 12th percentile, basic reading was in the 8th percentile, oral reading fluency was in the 8th percentile, reading comprehension was in the 27th percentile, and reading fluency and comprehension were in the 10th percentile. After the Reevaluation Report, the Downingtown School District and Parents agreed that the May 17, 2018 IEP would provide D.S. with the Tier 3 *Wilson Reading System* in sixth grade. The May 17, 2018 IEP removed the reading comprehension goal that had been included in the three prior IEPs.

In the May 2018 IEP, the AIMSweb fall 2017 assessment measured oral reading at 74 words correct per minute out of a 114 grade-level benchmark (10th percentile) and MAZE reading comprehension at 10 correct responses out of a 16 grade-level benchmark (14th percentile). The AIMSweb winter 2018 assessment measured reading fluency at 84 words correct per minute out of a 129 grade-level benchmark (9th percentile) and MAZE reading comprehension at 18 correct responses out of a 21 grade-level benchmark (27th percentile). On the F&P assessment, D.S. progressed from level P in the fall of 2017, to level T in November 2017, to level R in the winter of 2018, and to level S in the spring of 2018. According to the F&P *Benchmark Assessment System*, by the end of fifth grade, any level below U requires intensive intervention.

In August 2018, upon Parents' own initiative, D.S. was evaluated by Dr. Matthew Richmond, who performed an independent neuropsychological evaluation. Though D.S. was about to enter sixth grade, the evaluation found D.S. to have a broad reading score at a 1.6 grade level, letter-word identification at a <K.0 grade level, passage comprehension at a 3.9 grade level, oral reading at a 2.5 grade level, word attack at a 3.1 grade level, sentence reading fluency at a 3.6 grade level, broad written language at a 4.5 grade level, writing samples at a 5.2 grade level, sentence writing fluency at a 5.0 grade level, and spelling at a 3.9 grade level.[4] Dr. Richmond recommended, at a minimum, that D.S. receive separate reading comprehension goals for "author's purpose, basic textual content questions, and extension questions with both concrete and abstract applications." (A.R., Doc. 9-2, at p. 150).

On September 24, 2018, Parents and the Downingtown School District met to revise the May 2018 IEP and to discuss D.S.'s need for assistive technology. D.S. received an iPad keyboard and an app to support audiobooks. Not all materials were available in audio format.

On October 30, 2018, Parents sent a Notice letter to the Downingtown School District advising that if D.S. did not receive appropriate programming at the

---

[4]     The digit after the decimal point indicates the point in time during the school year. For example, .4–.6 is mid-school year.

Downingtown School District, Parents would place D.S. at a private school and seek reimbursement.  On the same date, Parents also provided the Downingtown School District with the results of Dr. Richmond's private neuropsychological evaluation.  On November 7, 2018, the Downingtown School District and Parents met again to revise the IEP.  The revised IEP provided for a general reading comprehension goal of, after reading a passage, increasing the number of correct responses from 23 to 28.  The Downingtown School District planned to implement the comprehension goal via a general education class that was less remedial in nature than *Read 180*, the reading comprehension program D.S. had received in fifth grade.  Dissatisfied, Parents withdrew D.S. from the Downingtown School District on November 19, 2018, and enrolled D.S. at Delaware Valley Friends School ("Friends"), a school for children with learning differences that provides multisensory instruction based on Orton-Gillingham principals and individualized instruction.

Parents obtained an updated independent neuropsychological evaluation in May 2019.  The evaluation revealed deficits in D.S.'s attention/concentration, verbal memory, and verbal inhibition, reflecting weaknesses with tasks involving words, numbers, and letters.  Parents made this new evaluation—which suggested, *inter alia*, a structured educational setting with significant support—available to the Downingtown School District.

The Downingtown School District met in June 2019 to create an IEP for D.S.'s seventh-grade school year (2019–20).  Presumably, the purpose of this meeting was for Parents to decide—based on the Downingtown School District's proposed program for the next year—whether D.S. would remain enrolled at Friends or would return to the Downingtown School District.  Prior to that meeting, the Downingtown School District had asked Friends for D.S.'s student records.  Friends requested that the Downingtown School District provide a signed release from Parents.  Though the Downingtown School District did not send Parents a release to sign, it received limited information from Friends that included a reading assessment, a student profile, and final grades.  In addition, Parents sent documents to the Downingtown School District that included reading scores, teacher comments, test results, and attendance records.[5]  On July 10, 2019, the IEP was revised to take into consideration the updated, May 2019 private neuropsychological evaluation of D.S., which the Downingtown School District received from Parents.  The section in the IEP regarding present levels of academic achievement and functional performance contained limited information from after D.S. enrolled at Friends and consisted primarily of data from when D.S. attended the Downingtown School District.  D.S. remained enrolled at Friends for the 2019–20 school year.

---

[5]     Although the documents Parents sent to the Downingtown School District are in the Administrative Record, nothing in the record indicates that Parents sent those documents to the Downingtown School District.  That fact is taken from Parents' response.  [ECF 20].

**APPLICABLE LAW AND LEGAL STANDARD**

Parents filed a due process complaint pursuant to the IDEA, Section 504, [6] and the ADA. The obligation to provide a FAPE is substantively the same under Section 504 as under the IDEA. *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 253 (3d Cir. 1995); *see also Lower Merion Sch. Dist. v. Doe*, 878 A.2d 925 (Pa. Commw. Ct. 2005). The substantive standards for evaluating claims under Section 504 and the ADA are also essentially identical. *See, e.g.*, *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 282–83 (3d Cir. 2012). [7] Here, Parents' Section 504 and ADA claims challenging the Downingtown School District's obligation to provide D.S. a FAPE rely on the same grounds as their claims under the IDEA. Therefore, these claims will be jointly addressed.

Under the IDEA, institutions that receive federal education funding are required to provide a FAPE to children with disabilities. 20 U.S.C. § 1400(d)(1)(A), 1412(a)(1)(A); *Endrew F. ex rel. Joseph F. v. Douglas Sch. Dist.*, — U.S. —, 137 S. Ct. 988, 993 (2017); *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 244 (3d Cir. 2012). A FAPE "includes both 'special education' and 'related services.'" *Endrew F.*, 137 S. Ct. at 994 (citing 20 U.S.C. § 1401(9), (26), (29)); *see also* 34 C.F.R. § 300.17. Once a school district identifies a child as disabled, the school district must develop an IEP for the child that is "reasonably calculated to enable [the] child to make progress appropriate in light of the child's circumstances." *Endrew F.*, 137 S. Ct. at 1001; *see also* 20 U.S.C. § 1414(d)

---

[6]     Section 504 prohibits discrimination on the basis of a handicap or disability. 29 U.S.C. § 794. A person has a handicap if the person "has a physical or mental impairment which substantially limits one or more major life activities," has a record of such impairment, or is regarded as having such impairment. 34 C.F.R. § 104.3(j)(1). "Major life activities" include learning. 34 C.F.R. § 104.3(j)(2)(ii).

[7]     Courts have long recognized the similarity between claims under Section 504 and the ADA, particularly when considered together with claims under the IDEA. *See, e.g.*, *Swope v. Cent. York Sch. Dist.*, 796 F. Supp. 2d 592, 598 (M.D. Pa. 2011); *Taylor v. Altoona Area Sch. Dist.*, 737 F. Supp. 2d 474, 487 (W.D. Pa. 2010); *Derrick F. v. Red Lion Area Sch. Dist.*, 586 F. Supp. 2d 282, 298 (M.D. Pa. 2008).

(defining IEP); *Mary Courtney T. v. Sch. Dist. of Phila.*, 575 F.3d 235, 240 (3d Cir. 2009). "The adequacy of a given IEP turns on the unique circumstances of the child for whom it was created." *Endrew F.*, 137 S. Ct. at 1001. It must "set out a plan for pursuing academic and functional advancement." *Id.* at 999 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(I)–(IV)). Although the state is not required to "maximize the potential of every handicapped child," it must provide an education that confers a "meaningful benefit." *Ridley*, 680 F.3d at 268. "[E]vidence of a student's later educational progress may [] be considered in determining whether the original IEP was reasonably calculated to afford some educational benefit." *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 567 (3d Cir. 2010) (quoting *Fuhrmann ex rel. Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1036 (3d Cir. 1993)).

The core of the IDEA is the collaborative process between parents/guardians and school officials to fashion the IEP. *Endrew F.*, 137 S. Ct. at 994 (citing 20 U.S.C. § 1414). This collaboration among the parents/guardians and educators ensures careful consideration of the child's individual circumstances. *Id.* "It is through the IEP that the 'free appropriate public education' required by the Act is tailored to the unique needs of a particular child." *Id.* at 1000 (internal quotations and alteration omitted). "The IDEA requires that every IEP include 'a statement of the child's present levels of academic achievement and functional performance,' describe 'how the child's disability affects the child's involvement and progress in the general education curriculum,' and set out 'measurable annual goals, including academic and functional goals,' along with a 'description of how the child's progress toward meeting' those goals will be gauged." *Id.* at 994 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(I)–(III)). "An IEP is not a form document. It is constructed only after careful consideration of the child's present levels of achievement, disability, and potential for growth." *Id.* at 999. The instruction offered must be

10

specially designed to meet the child's unique needs through an individualized education program. 20 U.S.C. § 1401(29).

If parents believe that an IEP fails to provide their child with a FAPE, they may seek an administrative "impartial due process hearing."  20 U.S.C. § 1415(f).  The party requesting the due process hearing does so via a "complaint notice," 20 U.S.C. § 1415(b)(7), and the due process hearing cannot go beyond the issues raised in the complaint notice unless the parties agree otherwise, 20 U.S.C. § 1415(f)(3)(B).   The pleading standards are minimal, requiring "a description of the nature of the problem" and "a proposed resolution." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 54 (2005) (citing 20 U.S.C. § 1415(b)(7)(B)(ii)–(iii)).

"Any party aggrieved by the findings and decision" made in the administrative proceeding "shall have the right to bring a civil action" in state or federal court.  20 U.S.C. § 1415(i)(2)(A). The district court shall review the record of the administrative proceedings, hear additional relevant, non-cumulative, and useful evidence at the request of a party and, based on a preponderance of the evidence, grant such relief as it deems appropriate.   20 U.S.C. § 1415(i)(2)(C); *Susan N. v. Wilson Sch. Dist.*, 70 F.3d 751, 760 (3d Cir. 1995).

The standard of review of an administrative decision in district court is a "modified *de novo*" review wherein courts must give "due weight" to the hearing officer's decision and the administrative proceedings. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 205–06 (1982); *Shore Reg. High Sch. Bd. of Educ. v. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004); *S.H. v. State-Operated Sch. Dist. of Newark*, 336 F.3d 260, 270 (3d Cir. 2003).  A district court must defer to such factual findings and credibility determinations unless the district court can identify contrary, non-testimonial evidence in the record or explain why the record, read in its entirety, compels a different conclusion. *S.H.*, 336 F.3d at 270.  This "due weight" standard means

that the district court shall consider the hearing officer's factual findings as *prima facie* correct. *Id.*  "Whether an IEP is appropriate is a question of fact."  *D.S.*, 602 F.3d at 564.  The district court's review of a hearing officer's application of legal standards and conclusions of law, however, requires no deference to the administrative hearing officer's legal determinations; rather, the legal determinations are subject to plenary review.  *Carlisle Area Sch. Dist. v. Scott P.*, 62 F.3d 520, 528 n.3 (3d Cir. 1995).

Courts are not free to "substitute their own notions of sound education policy for those of the educational agencies they review."  *Susan N.*, 70 F.3d at 757 (citing *Rowley*, 458 U.S. at 205–06).  Courts must not impose "their view of preferable educational methods upon the States."  *Rowley*, 458 U.S. at 207.  Neither can parents "compel a school district to provide a specific program or employ a specific methodology in educating a student."  *J.E. v. Boyertown Area Sch. Dist.*, 834 F. Supp. 2d 240, 246 (E.D. Pa. 2011), *aff'd sub nom. J.E. ex rel. J.E. v. Boyertown Area Sch. Dist.*, 452 F. App'x 172 (3d Cir. 2011).  Even the school is not required to select "the program supported by the optimal level of peer-reviewed research," as long as the method used is "reasonably calculated" to provide an educational benefit.  *Ridley*, 680 F.3d at 277.  The question is not whether a program is ideal, but rather whether it is reasonable.  *Endrew F.*, 137 S. Ct. at 999.

The party challenging the administrative decision bears the burden of persuasion before the district court as to each claim challenged.  *Ridley*, 680 F.3d at 270 (citations omitted).  As the United States Supreme Court has noted, "[t]he burdens of pleading and proof with regard to most facts have been and should be assigned to the [party] who . . . seeks to change the present state of affairs."  *Schaffer*, 546 U.S. at 56 (*quoting* 2 McCormick on Evidence § 337 at 412 (5th ed.)).  Under the IDEA, it is the party "aggrieved by the findings and decision" of the hearing officer that seeks to change the present state of affairs.  *See* 20 U.S.C. § 1415(i)(2)(A).  "Absent some reason

12

to believe that Congress intended otherwise," the burden of persuasion falls where it usually does—on the party seeking relief. *Schaffer*, 546 U.S. at 57–58.

**DISCUSSION**

As noted, Parents filed a due process complaint before the Office for Dispute Resolution, claiming that D.S. was denied a FAPE.  The matter was heard by a HO, and following evidentiary hearings, the HO concluded that (1) Parents' claims prior to May 16, 2017, were barred as untimely, (2) the Downingtown School District did not deny D.S. a FAPE prior to the fall of 2018, and (3) the Downingtown School District's program implemented in the fall of 2018 and the proposed programs for November 2018 and July 2019 denied D.S. a FAPE, and, therefore, the Downingtown School District owed Parents tuition reimbursement and related expenses.  In this appeal, the parties each challenge those portions of the HO's decision that were adverse to them. For ease of discussion, this Court will address the parties' arguments with respect to each school year.

**I.      The 2016–17 School Year**

In their due process complaint filed on May 16, 2019, Parents asserted that D.S. was denied a FAPE for the 2016–17 school year and sought compensatory education as a remedy.  The Downingtown School District denied the allegations and moved to dismiss Parents' claims for the 2016–17 school year on the basis that they were barred by the applicable two-year statute of limitations.  As noted, following an evidentiary hearing on this issue, the HO issued a Final Interim Ruling that granted the motion and barred, as untimely, all claims arising before May 16, 2017. Parents argue that the HO erred in applying the statute of limitations.  Parents are mistaken.

The IDEA provides that a "parent . . . shall request an impartial due process hearing within 2 years of the date the parent or agency knew or should have known about the alleged action that

13

forms the basis of the complaint." 20 U.S.C. § 1415(f)(3)(C); 34 C.F.R. § 300.511(e). This two-year statute of limitations also applies to § 504 claims, *P.P. v. West Chester Area Sch. Dist.*, 585 F.3d 727, 737 (3d Cir. 2009), and to related ADA claims, *Patrick B. ex rel. Keshia B. v. Paradise Protectory & Agric. Sch.*, 2012 WL 3233036 (M.D. Pa. Aug. 6, 2012). The only statutory exceptions to this timeline are "specific misrepresentations by the local educational agency that it had resolved the problem forming the basis of the complaint" or "the local educational agency's withholding of information from the parent that was required under this subchapter to be provided to the parent." 20 U.S.C. § 1415(f)(3)(D). Parents do not argue that either exception applies.

This "limitations period functions in a traditional way, that is, as a filing deadline that runs from the date of reasonable discovery[.]" *G.L. v. Ligonier Valley Sch. Dist. Auth.*, 802 F.3d 601, 616 (3d Cir. 2015). Thus, the limitations period begins to run when "the plaintiff did discover or a reasonably diligent plaintiff would have discovered the facts constituting the violation[.]" *Id.* at 614 (quoting *Merck & Co. v. Reynolds*, 559 U.S. 633, 653 (2010)). Mere knowledge of the education a school is providing a child is insufficient; what parents must discover is that the education amounts to a violation. *E.G. v. Great Valley Sch. Dist.*, 2017 WL 2260707, at *8 (E.D. Pa. May 23, 2017). Once "a violation is reasonably discovered by the parent, any claim for that violation, however far back it dates, must be filed within two years of the 'knew or should have known' date." *G.L.*, 802 F.3d at 620. If a parent fails to timely file, "all but the most recent two years before the filing of the complaint will be time-barred[.]" *Id.* Furthermore, when one claim is time-barred but another is not, parents may not merge the different violations into a single claim in an attempt to bypass the statute of limitations. *Id.* at 625. A hearing officer must perform a "fine-grained analysis" to determine the discovery dates in a complaint alleging multiple violations. *E.G.*, 2017 WL 2260707, at *9.

14

In *G.L.*, the United States Court of Appeals for the Third Circuit (the "Third Circuit")

addressed the statute of limitations applicable in IDEA cases as follows:

> [A]lthough a child's right to special education under the IDEA does not turn
> on parental vigilance, parental vigilance is vital to the preservation and enforcement
> of that right.  As we made clear in *D.K.* [*v. Abington Sch. Dist.*, 696 F.3d 233 (3d
> Cir. 2012)], claims that *are* known or reasonably should be known to parents must
> be brought within two years of that "knew or should have known" date, and parents
> may not, without satisfying one of the two statutory exceptions, knowingly sit on
> their rights or attempt to sweep both timely and expired claims into a single
> "continuing violation" claim brought years later.  Parents are often in a position to
> be forceful advocates for their children and through their vigilance and
> perseverance to help fulfill the IDEA's promise of a free appropriate public
> education.  That "cooperative process . . . between parents and schools" that results
> from a parent's action, after all, is at the very "core of the statute" itself.  Thus the
> sooner parents start that process and secure appropriate intervention and remedial
> supports after they discover or reasonably should have discovered the need for it,
> the better for the well-being of the child, the goals of the school district, and the
> relationship between the family and school administrators.
>
> On the other hand, where parents neither knew nor reasonably should have
> known of the special needs of their child or of the educational system's failure to
> respond appropriately to those needs, the other partner in this endeavor—the school
> district itself—still has its independent duty to identify those needs within a
> reasonable time period and to work with the parents and the IEP team to
> expeditiously design and implement an appropriate program of remedial support.
> This is a profound responsibility, with the power to change the trajectory of a
> child's life.  Thus, the corollary to *D.K.* is that when a school district has failed in
> that responsibility and parents *have* taken appropriate and timely action under the
> IDEA, then that child is entitled to be made whole with nothing less than a
> "complete" remedy.  Compensatory education is crucial to achieve that goal, and
> the courts, in the exercise of their broad discretion, may award it to whatever extent
> necessary to make up for the child's lost progress and to restore the child to the
> educational path he or she would have traveled but for the deprivation.  In this way,
> the courts too have an essential function in fulfilling Congress's mandate in the
> IDEA and enabling each child with special needs to reach his or her full potential.
>
> For these reasons, we hold today that, absent one of the two statutory
> exceptions found in § 1415(f)(3)(D), parents have two years from the date they
> knew or should have known of the violation to request a due process hearing
> through the filing of an administrative complaint and that, assuming parents timely
> file that complaint and liability is proven, Congress did not abrogate our
> longstanding precedent that "a disabled child is entitled to compensatory education
> for a period equal to the period of deprivation, but excluding the time reasonably
> required for the school district to rectify the problem."

802 F.3d at 625–26 (internal citations omitted).

In the Final Interim Ruling, the HO concluded that *only* claims arising on or after May 16, 2017, could be considered, finding that Parents possessed the requisite knowledge by the end of the 2016–17 school year to have then filed a due process complaint and that, by failing to do so, Parents were untimely in bringing the claims that arose before May 16, 2017. The HO's determination was based on the following findings of fact, summarized as follows:

> In the spring of 2015, D.S. was evaluated because of concerns with language arts (reading and writing) skills and for performance "well below grade level expectations" despite interventions including small-group support. Parents participated in the October 2015 IEP meeting with the school personnel and acknowledged receipt of the Procedural Safeguards Notice. The October 2015 IEP contained annual goals addressing articulation (producing specific sounds with quantified accuracy), reading comprehension (from a below benchmark level to a higher but still below benchmark level with quantified accuracy), and written expression (increasing writing fluency to a quantified 10th percentile). Program modifications and items of specially designed instruction in the October 2015 IEP addressed deficits in reading fluency and comprehension, written expression, spelling, and articulation, as well as test and assignment accommodations. The IEP provided for learning support at a supplemental level, with D.S. outside of the general education environment for language arts instruction and speech/language therapy. Parents approved the accompanying NOREP.

> Parents communicated with the teacher about D.S.'s reading needs and writing difficulties during the 2015–16 school year. Parents received progress monitoring reports in December 2015 that reflected improvement on but not mastery of the October 2015 IEP goals. Progress monitoring reports in March 2016 reflected similar deficiencies. In the spring of 2016, Parents and the Downingtown School District discussed D.S.'s difficulties with reading and writing, the need for additional support and more intensive interventions to address writing, and D.S.'s difficulties with meeting benchmark expectations in reading. D.S.'s IEP was revised in May 2016 because D.S. reportedly continued to perform below grade-level benchmarks in reading fluency, was overall below the specified grade level in reading skills throughout the school year, and continued having difficulty with written expression skills and articulation. This IEP also described the program provided to address reading and writing skills in a small group. D.S.'s needs, as indicated in the May 2016 IEP, continued to be reading fluency and comprehension, written expression, and articulation. Annual goals targeted articulation (producing specific sounds with quantified accuracy), reading comprehension (from a below benchmark level to a higher but still below benchmark level with quantified accuracy), reading fluency

(from a below benchmark level to a higher but still below benchmark level), and written expression (increasing rubric scores for writing conventions to 2 of 4 categories at grade level). D.S.'s final report card for the 2015–16 school year reflected strengths and weaknesses, with progress monitoring indicating progress toward but not mastery of the articulation and reading fluency goals and mastery of the October 2015 reading comprehension goal (still below grade-level expectations).

Parents communicated with teachers over the course of the 2016–17 school year, including about D.S.'s reading and writing needs. Progress monitoring reports in December 2016 and in March 2017 reflected improvement on but not mastery of the May 2016 IEP goals. The IEP was revised in May 2017, with Parents participating in the IEP meeting and acknowledging receipt of the Procedural Safeguards Notice. At the time of the May 2017 IEP meeting, D.S. reportedly continued to perform below grade-level benchmarks in reading fluency and overall was below the specified grade level in reading skills throughout the school year. Word identification/spelling skills were similarly well below expectations (between the 3rd and 8th percentile). D.S. experienced continued difficulty with written expression skills and articulation. This IEP described the program provided to address reading and writing skills in a small group. Needs in the May 2017 IEP remained reading fluency and comprehension, written expression, and articulation. Annual goals targeted articulation (producing age-appropriate sounds with quantified accuracy), reading comprehension (from a below benchmark level to a higher but still below benchmark level with quantified accuracy), reading fluency (from a below benchmark level to benchmark level), and written expression (increasing rubric scores for paragraph writing). Program modifications and specially designed instruction continued to address needs. The May 2017 IEP proposed learning support at a supplemental level. D.S.'s final report card for the 2016–17 school year included progress monitoring indicating significant progress toward the articulation goal, progress toward but not mastery of the reading fluency and comprehension goals (both below grade-level expectations), and progress toward but not mastery of the written expression goal. In the fall of 2017, Parents and the teacher discussed the need for a reevaluation of D.S.

(A.R., Doc. 9, at pp. 394–98).

The HO concluded that Parents knew or should have known of the asserted violations by the end of the 2016–17 school year based on, *inter alia*, (1) the IEP documents Parents reviewed, which described the programs used for D.S.'s reading and writing needs and showed that D.S. was progressing but consistently not meeting expectations or goals, (2) Parents' knowledge of the relevant facts regarding D.S.'s disability and how the disability was manifesting, and (3) D.S.'s responses to the various education modalities and programming. The HO also noted that Parents

received D.S.'s entire writing journal at the end of the 2015–16 school year and that they received and returned the Procedural Safeguards Notice on multiple occasions acknowledging receipt of the progress reports, which included notice of the two-year statute of limitations in which to file a due process complaint and the options available to Parents if they were dissatisfied with a school's proposed or implemented programming.

As the HO found, and is nowhere challenged by Parents' evidence or arguments, Parents received ongoing reports that D.S.'s reading goals were consistently below grade-level expectations.  The IEPs specified the benchmarks for applicable goals, which were not met.  This Court agrees with the HO that these reports were sufficient to alert or provide knowledge to a reasonably diligent parent to make inquiries into the appropriateness of the special education programs being offered during the 2015–16 and 2016–17 school years.  Thus, in light of the holding in *G.L.*, absent one of the two statutory exceptions found in § 1415(f)(3)(D) of the Act, Parents had two years from the date they knew or should have known of the violation to request a due process hearing.  The HO concluded based on the above-summarized facts that Parents knew or should have known that D.S. was denied a FAPE during the 2016–17 school year yet failed to timely file a due process complaint.  This Court recognizes that its review is a modified review of the facts and that it owes due deference to the HO's factual determinations.  Parents have not pointed to, and this Court cannot identify, any contrary, non-testimonial evidence in the record that compels a different conclusion.  Thus, this Court agrees with the HO's factual analysis and the determination that Parents knew or should have known of the violations by the close of the school year ending in 2017 and could have requested a due process hearing in a timely manner.  Therefore, with respect to Parents' claims premised on 2016–2017 school years, this Court affirms the decision of the HO and enters judgment in favor of the Downingtown School District.

## II.     The 2017–18 School Year

With respect to the 2017–18 school year, the HO determined that from May 16, 2017, until the end of the 2017–18 school year, D.S. demonstrated a level of progress sufficient to show that D.S. was not denied a FAPE.   Parents challenge this conclusion and seek an award for compensatory education for 2017–18 school year.[8]

Parents argue that beginning in the 2015–16 school year, the IEP teams were acutely aware of D.S.'s testing results but failed to provide the necessary intensive interventions to allow D.S. to progress in reading.   Parents point out that although D.S.'s testing results corresponded to a Tier 3 intervention, the Downingtown School District did not place D.S. in the *Wilson Reading System* until after the May 2018 IEP.   The Downingtown School District disagrees with Parents' contentions, maintaining that the Downingtown School District provided D.S. with a FAPE during all relevant time periods.   The Downingtown School District posits that a FAPE cannot be tied to one specific program (*i.e.*, the *Wilson Reading System*), the IEPs offered appropriately challenging goals, and D.S.—despite a failure to meet the IEP goals—still showed improvement.   The Downingtown School District further argues that Parents' due process complaint, with regard to the 2018–19 school year, only raised the issue of whether "the 2018 IEP was appropriately ambitious," and, therefore, Parents waived arguments related to a failure to implement the May 2018 IEP, contrary to the HO's finding.   As explained further below, this Court agrees with the HO that D.S. was provided a FAPE from May 16, 2017, through the end of the 2017–18 school year.

---

[8]      As discussed above, this Court affirms the HO's conclusion that all of Parents' claims arising before May 16, 2017, are barred by the statute of limitations.   This decision leaves Parents' claims arising after that date, which include claims attributable to the last few weeks of D.S.'s 2016–17 school year.   For ease of discussion, Parents' claims for May and June of 2017 will be considered within this Court's discussion of Parents' remaining claims for the 2017–18 school year.

At the center of a district court's analysis as to whether an educational program denied a student a FAPE is the determination of whether the educational program is reasonable. *Rowley*, 458 U.S. at 207. As noted, an IEP must be designed for a child to make progress appropriate in light of the child's circumstances, *Endrew F.*, 137 S. Ct. at 999, or intellectual potential, *Courtney T.*, 575 F.3d at 240. However, the LEA is not obligated to "provide 'the optimal level of services,' or incorporate every program requested by the child's parents." *Ridley*, 680 F.3d at 269 (citations omitted).

Although D.S. did not meet expectations during the 2017–18 school year, as explained by the HO, D.S. showed consistent progress during this time period, improving in the areas of reading, decoding, fluency, comprehension, and written expression. Specifically, D.S.'s test scores show that when entering the fifth-grade school year, D.S.'s most recent AIMSweb scores were in the 8th percentile in oral reading fluency and the 12th percentile in reading comprehension. In the fall of 2017, D.S. tested in the 10th percentile in oral reading fluency and in the 14th percentile in reading comprehension. In the winter of 2018, D.S.'s score in oral reading fluency dropped to the 9th percentile and the score in reading comprehension increased to the 27th percentile. On a computer-based reading assessment, D.S.'s scores progressed throughout fifth grade from 591 in September, to 598 in November, to 652 in January, and to 797 in April. For the F&P benchmarking, D.S. was reading at level P with 95% accuracy in the fall, level R with 98% accuracy in the winter, and level S with 96% accuracy in the spring. In light of these improvements, this Court concurs with the HO's findings, affirms the HO's decision with respect to the 2017–18 school year, and finds that D.S. was not denied a FAPE.

III.    **2018–19 School Year**

As to Parents' claims with respect to the 2018–19 school year, Parents argue that D.S. was denied a FAPE because of the lack of appropriate reading comprehension instruction and access to the curriculum.  The Downingtown School District argues that Parents have waived this "implementation" claim because they did not raise it in their due process complaint, and, therefore, the HO erred and exceeded the HO's authority in finding that C.S. was denied FAPE by how the May 2018 IEP was implemented.  The Downingtown School District further argues that the HO did not apply the correct standard for assessing FAPE based on the implementation of an IEP.  The Downingtown School District cites to an unpublished, pre-*Endrew*, Third Circuit case, *Melissa S. v. The Downingtown School District of Pittsburgh*, in which the court held, "[t]o prevail on a claim that the Downingtown School District failed to implement an IEP, a plaintiff must show that the school failed to implement substantial or significant provisions of the IEP, as opposed to a mere *de minimis* failure, such that the disabled child was denied a meaningful educational benefit."  183 F. App'x 184, 187 (2006) (citing *Houston Indep. Sch. Dist. v. Bobby R.*, 200 F.3d 341, 349 (5th Cir. 2000)).

The Downingtown School District's implementation waiver argument is, however, misplaced.  A careful reading of the entire due process complaint reveals that Parents' due process complaint included claims regarding the implementation and development of a FAPE.  The due process complaint allegations meet the minimal pleadings standards required in *Schaffer*.  546 U.S. at 54.  In addition, the Downingtown School District's argument and reliance on the *Melissa S.* implementation standard is inapplicable.  *Melissa S.* is an unpublished, *pre-Endrew* opinion and, as such, provides no persuasive guidance to this Court.

As to the merits of Parents' claim with respect to the 2018–19 school year, this Court agrees with the HO's reasoning and finds that the implementation of the May 2018 IEP in the fall of the 2018–19 school year did not provide D.S. a FAPE.  The HO was also critical, and this Court agrees, that it was not evident whether and when any monitoring of the reading skill was implemented during the 2018–19 school year other than the continuation of noting the benchmark assessments when, clearly, D.S. was not meeting those benchmark goals.  The HO further found that during the fall of the 2018–19 school year, the Downingtown School District was or should have been on notice that D.S.'s reading comprehension skills still required individualized intervention.  Though the IEP team recognized that direct instruction in vocabulary and reading comprehension were necessary, the school decided that these concerns would be addressed in general education rather than in special education.  Finally, the Downingtown School District did not ensure that D.S. had access to the general education curriculum through the use of assistive technology.  The HO found, and this Court agrees, that these circumstances evidenced a denial of FAPE.

Despite finding that the Downingtown School District's implementation of the IEP denied D.S. a FAPE as of November of the 2018–19 school year, the HO inexplicably denied Parents an award of compensatory education.  Parents challenge this denial.

Where a district court finds the denial of FAPE, it "is authorized to grant 'such relief as the court determines is appropriate,' including attorneys' fees, reimbursement for a private educational placement, and compensatory education."  *A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 802 (3d Cir. 2007) (citing 20 U.S.C. § 1415(i)(3)(B)(i) (attorneys' fees); *Burlington Sch. Comm. v. Dep't of Educ.*, 471 U.S. 359, 369 (1985) (reimbursement); *Lester H. v. Gilhool*, 916 F.2d 865, 873 (3d Cir. 1990) (compensatory education)).  "Compensatory education 'aim[s] to place disabled children in the same position they would have occupied but for the school district's violations of

IDEA,' by providing the educational services children should have received in the first instance." *G.L.*, 802 F.3d at 608 (quoting *Reid v. District of Columbia*, 401 F.3d 516, 518 (D.C. Cir. 2005)). The Third Circuit has consistently held that "a child's right to compensatory education 'accrue[s] from the point that the school district knows or should know' of the injury to the child, and the child 'is entitled to compensatory education for a period equal to the period of deprivation, but excluding the time reasonably required for the school district to rectify the problem.'" *Id.* (citations omitted). Here, this Court finds, as did the HO, that D.S. was denied a FAPE for the fall of the 2018–19 school year and that the school never corrected it. As such, D.S. is entitled to an award of compensatory education for this period. This Court, accordingly, remands this case to the HO for a determination of the amount of compensatory education due to Parents for the denial of FAPE in the fall of 2018. *A.A. ex rel. E.A. v. Exeter Twp. Sch. Dist.*, 485 F. Supp. 2d 587, 590 (E.D. Pa. 2007) (citing *Carlisle*, 62 F.3d 520, 526 (3d Cir. 1995)) (authorizing IDEA remands to state administrative adjudication).

The HO did, however, award Parents tuition reimbursement for the portion of the 2018–19 school year during which D.S. attended private school. The Downingtown School District challenges this award of tuition reimbursement.

Under the IDEA, parents dissatisfied with a school district's placement for their child may unilaterally place the child in a private school and then seek retroactive tuition reimbursement from the school district. With the Supreme Court's precedents in *School Committee of Town of Burlington v. Department of Education of Massachusetts*, 471 U.S. 359 (1985), and *Florence County School District Four v. Carter ex rel. Carter*, 510 U.S. 7 (1993), "a three-step analysis should be applied to determine whether to order tuition reimbursement." *Sinan L. v. Sch. Dist. of Phila.*, 2007 WL 1933021, at *5 (E.D. Pa. July 2, 2007). Under the so-called "*Burlington-Carter*

test," a district court "must first determine if the [school district's] proposed IEP constituted an appropriate offer of a FAPE." *Id.* (citing *Carter*, 510 U.S. at 16). If the school district did not offer FAPE, the court must "next determine whether the parents' unilateral placement of the child at a private school was 'proper.'" *Id.* "Finally, the [c]ourt should consider whether 'equitable considerations are relevant in fashioning relief.'" *Id.* (citing *Burlington*, 471 U.S. at 374). Equitable reasons may include parents' failure to give notice to the school district that they were rejecting the school district's proposed placement at least ten business days prior to the "removal of the child from the public school," or "upon a judicial finding of unreasonableness with respect to actions taken by the parents." 20 U.S.C. § 1412(a)(10)(C)(iii)(I)(bb), (iii)(III); *see also C.H. v. Cape Henlopen Sch. Dist.*, 606 F.3d 59, 67 (3d Cir. 2010) ("[E]ven where private placement is appropriate and reimbursement is otherwise due, the IDEA permits the equitable reduction or elimination of tuition reimbursement under certain circumstances.") (relying on 20 U.S.C. § 1412(a)(10)(C)(iii)).

The Downingtown School District has presented no argument regarding whether Parents' placement of D.S. at Friends was not proper or whether equitable considerations do not support Parents' claim. As such, this Court will only consider step one of the *Burlington-Carter* test, *i.e.*, whether the proposed IEPs constituted an appropriate offer of a FAPE.

As discussed, by October 30, 2018, Parents had provided the Downingtown School District with the results of the independent neuropsychological report which showed, *inter alia*, that prior to the beginning of sixth grade, D.S.'s reading comprehension was at a 3.9 grade level. In his report, Dr. Richmond recommended that D.S. receive separate reading comprehension goals for "author's purpose, basic textual content questions, and extension questions with both concrete and abstract applications." (A.R., Doc. 9-2, at p. 150). Instead of following Dr. Richmond's minimum

recommendation for specific reading comprehension goals, the Downingtown School District suggested a general goal that after reading a passage, D.S. would increase the number of correct responses from 23 to 38.  In doing so, the Downingtown School District ignored Dr. Richmond's minimum recommendation without explanation.  In addition, knowing that D.S. was two years behind grade level on reading comprehension, the Downingtown School District proposed to implement a general reading comprehension goal via a general education class that was less remedial in nature than the *Read 180* reading comprehension program D.S. had received in fifth grade.  Based on the test results, the general reading goal, and the light-touch reading comprehension class, the November 2018 IEP was not reasonable, given D.S.'s history.  The private school offered the support D.S needed.

### IV.    2019–20 School Year

As noted, the HO found the July 10, 2019 IEP a mere repeat of the inappropriate November 2018 IEP.  "The IDEA requires that every IEP include 'a statement of the child's present levels of academic achievement and functional performance.'"  *Endrew F.*, 137 S. Ct. at 994 (citing 20 U.S.C. § 1414(d)(1)(A)(i)(I)).  The revised July 10, 2019 IEP contained very limited information from the time after D.S. enrolled at Friends and maintained the same general reading goal found as the November 7, 2018 IEP without considering any information regarding D.S.'s educational development and then-current levels of achievement and functional performance.  Without this "careful consideration" required under the IDEA and *Endrew*, the proposed July 10, 2019 IEP denied D.S. a FAPE.  Consequently, tuition reimbursement for D.S.'s enrollment at Friends for the 2019–20 school year is appropriate.[9]

---

[9]      In their respective motions, both parties seek an award of attorneys' fees.  If a party believes it is entitled to an award of attorneys' fees in light of this decision, it should file a timely motion.

**CONCLUSION**

For the reasons set forth herein, the parties' cross-motions are each granted, *in part*, and denied, *in part*.  Accordingly, judgment is entered in favor of the Downingtown School District with respect to Parents' claims premised on the 2016–17 and 2017–18 school years.  Judgment is entered in favor of Parents with respect to their claims for the 2018–19 and 2019–20 school years, and this matter is remanded to the HO for calculation of the amount of compensatory education due to Parents for the time period in the 2018–19 school year in which D.S. was enrolled at the Downingtown School District.  An Order consistent with this Memorandum Opinion follows.

*NITZA I. QUIÑONES ALEJANDRO*, U.S.D.C. J.